243 So.2d 703

**Leon MATTHEWS et al.**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, a Corporation et al.**

**6 Div. 757.**

Supreme Court of Alabama.

Feb. 4, 1971.

Whitmire, Morton & Coleman, Birmingham, for Ray Lawrence.

Ferris S. Ritchey, Jr., Birmingham, for Leon Matthews and Lloyd Hamilton.

Sadler, Sadler, Sullivan & Sharp, Birmingham, for appellees.

BLOODWORTH, Justice.

This case was originally assigned to another member of the court. It has been reassigned to the writer for an opinion.

This appeal is from a final decree rendered in favor of the appellee, Liberty Mutual Insurance Company in a declaratory judgment action, in equity.

The insurance company sought a determination as to its obligations to appellants under an insurance policy which it had issued. There was a jury empanelled in the cause. After written interrogatories were propounded to the jury and answered by its verdict, the trial judge entered the decree from which this appeal is taken.

One of the grounds assigned as error concerns the trial judge's communication with the jury during its deliberations in the jury room in the absence of both counsel and parties. After a careful consideration of the facts of the incident, we conclude that such action, in this instance, constitutes prejudicial error warranting reversal. The following excerpts from the record indicate how this matter arose.

"PROCEEDINGS

"MOTION FOR NEW TRIAL

"MR. MORTON: We call the Bailiff, Mr. Cordle

"CHARLES CLARKE CORDLE
BEING FIRST DULY SWORN, TESTI-
FIED AS FOLLOWS:

\* \* \* \* \* \*

"Q. Mr. Cordle, do you remember the occasion when Mr. Sharp and I were here in the trial of this case back in May of this year?

"A. Yes, sir.

"Q. Do you recall an occasion after Judge Barber had given the jury a charge and the jury had retired to the jury room in the back of the courtroom to make up their verdict, when there was a rap on the door?

"A. Yes, sir.

"Q. And did you go to the jury room and open the door following that rap?

"A. Yes, sir.

"Q. And did one of the jurors speak to you and make it known why they were rapping on the door?

"A. Yes, sir.

"Q. Will you state that in substance?

\*   \*   \*   \*   \*   \*

"A. The substance of what he said was that they wanted the Judge to give them further instructions on a charge.

\*   \*   \*   \*   \*   \*

"Q. Following that request, where the jurors requested this, what did you do?

"A. I went to the Judge and told him.

"WADE MORTON

being first duly sworn, testified as follows:

"MR. MORTON: My name is Wade H. Morton, I am an attorney at law. I practice at Birmingham, Alabama. I, me and my firm, represented Ray Lawrence, one of the respondents in this case that we are now taking this testimony in, in connection with a motion for a new trial. I was a trial lawyer in the case, and I sat through the trial of the case, and as I remember it, the evidence was concluded and the case was submitted to the jury for the jury to make up its verdict, somewhere immediately following lunch, as I recall it. Anyway, immediately following lunch, the jury did retire to the jury room in the back of this courtroom for the purpose of making up their verdict. I remained in the courtroom after the jury retired along with the three individual respondents in the case and the Vice President, I believe he was, of the Alabama Freight Company and Clarke. I don't recall the other man's name.

"MR. SHARP: Mr. Thornberry.

"MR. MORTON: Mr. Thornberry. Somewhere, probably shortly after 3:00 o'clock in the afternoon on May 13th, while I was standing in the courtroom, there was a rap on the door of the jury room. The Judge's bailiff, who just testi-

fied, was here in the courtroom, and he went to the door of the jury room and opened the door. One of the jurors said to him, in a voice that was audible in this courtroom, that they would like the Judge to give them some additional instructions, and they said they wanted some instructions with respect to one of the given charges in the case. The bailiff closed the door, left the courtroom and went in the direction of the Judge's chambers and immediately thereafter Judge Barber entered the courtroom from the doors leading out of the corridor, and I was standing opposite the doors on the opposite side of the courtroom; and the Judge came toward me until he reached the center aisle in the courtroom, and he turned without saying anything to me and went directly to the jury room and went in the jury room and closed the door. John Morrow, who is also a lawyer and practicing attorney at this bar, was here in the courtroom and came over and talked to me during the time the Judge was in the jury room. After a time, not a great period of time, but a short period of time, Judge Barber returned to the courtroom from the jury room and closed the door and came to where I was standing over there in front of the window at the place I was at the time he came in. And the Judge said to me, in substance, that the jury wanted to know something with respect to one of the charges that had been given to the jury.

"THE COURT: I can't hear you.

"MR. MORTON: With respect to one of the charges that had been given to the jury by the Court, one of the written charges. And the Judge stood there a minute and left, and that is all I remember with respect to what took place at the time following when the jury rapped—someone in the jury room rapped on the door, and the bailiff went to the door, and I heard them ask if they could have some additional instructions, and I believe that's all.

"MR. SHARP: Mr. Morton, you didn't ask the Judge to take any action whatsoev-

er at that time? You didn't request any action one way or the other?

\* \* \* \* \* \*

"MR. MORTON: I took no immediate action.

"MR. SHARP: Thank you, Mr. Morton.

"MR. MORTON: I came to—I went to my office and started drawing up a motion.

"MR. SHARP: Now, was this the time that you started the preparation of this motion that was after the result was unfavorable to your client, is that correct?

"MR. MORTON: That was after the jury—I did not consider that the ruling of the jury was adverse to my client. I think the issues that made my bill, and the answers made to the interrogatories, propounded all in favor of the respondents and not the complainants, because I think the only two issues of the bills are answered affirmative in their favor.

"THE COURT: Well, my conclusion to what you say is, that you state in your opinion, in spite of the fact you have gained a verdict in your favor, you want a rehearing in the case?

\* \* \* \* \* \*

"MR. MORTON: Your Honor indicated to me the next morning you were going to enter a judgment for the complainant, and I asked you at the time to withhold the decree until I had time to make a motion.

\* \* \* \* \* \*

"THE COURT: Well, before you enter that [referring to a showing], gentlemen, I want to make a statement. I think it's called for, and I think in case this cause is appealed from my ruling by the Court, if that issue is germane to the—the Supreme Court would have the right and certainly would expect to hear from the Judge since statements have been made in testimony taken relative to what he did and didn't do. And so I will make this statement and I will subject myself to the right of counsel to cross examine me if they desire.

"In other words, I take the position of a witness, because testimony is being given about me about an occurrence which may or may not be germane to the issue in this case. And it is correct that my bailiff, Mr. Cordle, did come to my chambers where I was, within a period of about, I would say, 45 minutes or an hour after the conclusion of the trial. I admit here that I don't know whether it has any bearing or not, but at the conclusion of the trial, I had extracted from counsel an agreement that any verdict reached by the jury would be received by the bailiff or by the Court in the absence of counsel. I think the record will divulge that. I believe it is in it. I usually do that, and I have a recollection that I did it in this case. Immediately upon my bailiff making known to me that the jury desired, I believe as he put it, desired some instructions, I went directly to the jury room. And as I recall, I don't believe I spoke to anybody. I think that there were in the courtroom those persons enumerated by Mr. Morton in his testimony. They were standing around in various places and I went to the jury room. The door was closed, of course, and I opened the door, and without making any other remark to anybody in the jury room, I went directly to—well, I believe I did say, 'Who is the foreman?' or words to that effect. And I either said that, or there was a person sitting there with a pencil and a pad who I deemed to be the foreman. And so I can't remember whether I actually asked, or whether the gentleman, I don't even know who he was, spoke up. And he said, 'There is a question that we want to ask you about, an interrogatory in this case relative to a charge.' To tell you the truth about it, I don't remember which interrogatory and which charge it was, but he had reference to a written charge and my recollection is that he either assigned a number to the charge or he assigned a number to the interrogatory; I don't remember which. But the remark that I made to the jury was this, and this is all that I said to my best judgment: 'Ladies and gentlemen, when you consider this case, you are to

consider all the evidence, and you are to consider all the matters presented to you by the Court, and you are to consider them together.' And then I left the jury room. I did not deem it necessary to call in the attorneys in this case. My purpose in going in to the jury room was to ascertain whether or not such matters were represented there that would call for the presence of counsel. It may have been unwise for me not to call in all the lawyers in the case, although I am not convinced of that by any means. If I had deemed that any statement made by me would be prejudicial to anybody's rights in the case, or anybody should have any opportunity to object to a general statement such as the statement that I made, why, I would certainly from a knowledge of practice which I, of course, was engaged in for many years before I got to the bench, I certainly would have called in counsel. That is my judgment about it and if I was in error, if I made a mistake, that the Supreme Court or anybody else would consider unjust, prejudicial or harmful to the abstract rights of anybody, of course, I am just in error and that's all. In my humble opinion, I am not, and I don't want to argue my position about it, and I do feel, in justice to myself, I ought to make that statement. And I just feel like that there were justifications for my position and my statement. And I do not feel that either Mr. Morton's client or anybody else in the case was damaged or his rights trampled by anything that I did or failed to do. I believe that is about all the statement I want to make. Now, I would be glad to hear anybody else.

\*     \*     \*     \*     \*     \*

"JOHN C. MORROW,
being first duly sworn, testified as follows:

"DIRECT EXAMINATION

"Q. (BY MR. MORTON:) Mr. Morrow, will you state your name?

"A. John Morrow.

"Q. Are you a practicing attorney of the Birmingham Bar?

"A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. Back in May of this year when this case of Liberty Mutual Insurance, of which Mr. Sharp represented the complainant, and Ferris Ritchey and I represented separate respondents, were you present here in the courtroom after the jury had retired to make up their verdict?

"A. I was present during the deliberation of the jury in the case, but I didn't know the style of it.

"Q. You didn't know the style of it?

"A. No.

"Q. Were you present in the courtroom in about the middle of the afternoon when you heard a rap on the jury door?

"A. Yes, sir. I was.

"Q. And did you see the Judge's bailiff go to the jury room?

"MR. SHARP: Object to that question, Your Honor, as leading.

"THE COURT: Overrule.

"A. Yes, sir.

"Q. Will you tell the Judge what you saw and heard when the bailiff went to the jury room and opened the door?

\*     \*     \*     \*     \*     \*

"A. I saw Clarke go back to the door, stick his head in, and I heard something said, what it was I don't know. He did not come out with the verdict. He went in to see Judge Barber.

"Q. Did you see the Judge come into the courtroom?

"A. Then Judge Barber came into the courtroom, and you were on the left side of the courtroom, and Judge Barber went back to the jury room.

\*     \*     \*     \*     \*     \*

"Q. The Judge went back there to the jury room for a space of time following the case?

"A. He went in the jury room, whether he shut the door or not, I don't remember. He was in there for sometime, a little time, probably less than a minute. It wasn't long."

In an annotation at 41 A.L.R.2d 288, the prejudicial effect in a civil case of communications between court officials and jurors is discussed. With respect to communications between judge and jury it is stated, at page 306:

"In the majority of the cases considering the question, any communication between the trial judge and the jury or members thereof after submission of the case, elsewhere than in open court, or in the presence, or with the consent of, counsel, has been regarded as reversible error, either on the general ground of resulting prejudicial effect or because of rules of procedure or statutory provisions."

The reason for this rule is stated by the Indiana Court in Danes v. Pearson, 6 Ind. App. 465, 33 N.E. 976 (1893), and is quoted with approval in the annotation at page 305:

"* * * 'But a judge of the court occupies a different attitude towards the jury from that of any other person. In the heat and passion often engendered on the trial, in the conflicting arguments and statement of law by opposing counsel, the jury naturally look to the court to bring certainty out of the confusion. An act, a sentence, or a word from the presiding judge may exert a controlling influence on the verdict. It is for these reasons that a communication by the judge to the jury stands on a different basis from that of another person, and for a like reason the law should throw a higher degree of circumspection around such communications. * * *' "

In the more recent case of Glendenning v. Sprowls, 405 Pa. 222, 174 A.2d 865, 866 (1961), the Supreme Court of Pennsylvania expressed it thusly:

"It has been wisely stated that 'next to the tribunal being in fact impartial is the importance of its appearing so'. Shrager v. Basil Dighton Ltd., (1924) 1 K.B. 274, 284. This applies in a special way to the Judge and his relationship with the jury. Without doubting the worthy motives or the well-intentioned solicitude of the Judge for the wishes and welfare of the jurors, private communication by a Judge to or with the jury in the jury room and in the absence of counsel is almost certain to create suspicions and a belief of unfairness in the minds of many people. * * *" [Emphasis supplied]

And, as the Iowa Supreme Court observed in Daniels v. Bloomquist, 258 Iowa 301, 138 N.W.2d 868, 872 (1965):

"Whether or not injury or injustice has resulted to the litigants by reason of the conduct, is not our primary concern. Rather, our concern is with the implication that attaches to the administration of justice under these circumstances. Confidence in our judicial system is imperiled if such conduct is countenanced in jury trials. Conduct which if proved would give rise to doubt and disrespect, or the mere appearance of such conduct as will not meet with the approval of public opinion, must be severely condemned. It is only through the granting of a new trial in situations like this, as well as vigilant efforts by the officers of the court to prevent such occurrences, that public confidence in the jury system may be preserved. Rasmussen v. Miller, 268 Wis. 436, 68 N.W.2d 16, 18."

The propriety of communications between judge and jury in the absence of counsel in civil cases has been considered by our court in a number of previous

decisions.[1] Our research has disclosed the following cases which we consider to be relevant: Traylor v. Hughes, 88 Ala. 617, 7 So. 159 (1889); Kuhl v. Long, 102 Ala. 563, 15 So. 267 (1893); Feibelman v. Manchester Fire Assurance Co., 108 Ala. 180, 19 So. 540 (1895); McCutchen v. Loggins, 109 Ala. 457, 19 So. 810 (1895); Ashford v. McKee, 183 Ala. 620, 62 So. 879 (1913); Pettus v. Louisville & N. R. Co., 214 Ala. 187, 106 So. 807 (1926); Brown v. Barr, 269 Ala. 497, 113 So.2d 924 (1959); Bush v. Stanton, 273 Ala. 615, 143 So.2d 621 (1962).

■ We understand the general rule to be that the judge may not, in the absence of counsel, further instruct the jury, after their retirement, without making a reasonable effort to notify counsel or without some special circumstances or excuse being shown which reasonably prevented notice. Kuhl v. Long, supra; Feibelman v. Manchester Fire Assurance Co., supra.

Our court concluded in *Feibelman,* supra:

> "We can not inquire, in such a case, what instructions were given by the court to the jury—whether they were correct or incorrect, prejudicial or otherwise. * * * The only safe course therefore, when it is established that the court, without some overruling necessity therefor, gave instructions to the jury * * * in the absence of the complaining suitor's counsel, engaged in representing him on the trial, and without reasonable notice to them and opportunity to be present, is to withhold all inquiry and investigation into the correctness of the instructions or action of the court, and treat them as conclusively prejudicial, by reason of the suitor's deprivation of his constitutional right. * * *"

The rule enunciated in *Kuhl* and *Feibelman* has been applied in subsequent decisions. Bush v. Stanton, supra; Pettus v. Louisville & N. R. Co., supra.

But we have held that the trial judge may, in the absence of counsel, give a supplementary charge to the jury in open court which pertains only "to the defective character of the verdict," i. e., putting the verdict in proper form. Traylor v. Hughes, supra; Brown v. Barr, supra.

And, we have also stated that the judge may, in the absence of counsel, give a charge to the jury in open court urging them to reach a conclusion if they could do so without sacrificing principle or conviction. Ashford v. McKee, supra.

■ What we are confronted with in the instant case, however, are remarks made by the judge to the jury, not in open court, but in the sanctity of the jury room itself. One of the attorneys testified the door was closed, another testified he does not remember whether the judge closed the door or not. The judge does not state whether the door was open or closed.

Our court was faced with a similar factual situation in McCutchen v. Loggins, supra. The facts as reported in the bill of exceptions in the case were:

> " * * * 'The court commenced charging the jury at about two o'clock P.M., and they returned a verdict about eleven o'clock that night. While the jury were deliberating upon their verdict, the presiding judge entered the room where they were deliberating two or three times under the following circumstances: For convenience the jury remained during their deliberation in the court room, where the trial was had. About seven o'clock, the presiding judge entered the court room, with the consent of counsel for both parties, to ascertain if the jury had agreed on a verdict, with the view of having the bailiff order supper for them if they had not agreed.

---

1. We confine our discussion to civil cases since criminal cases may turn on constitutional concepts of right to counsel and presence of defendant at all critical stages of the trial. See, e. g., Berness v. State, 38 Ala.App. 1, 83 So.2d 607 (1953).

They had not agreed, and were sent to supper in a body, in charge of the bailiff. About ten o'clock, the judge, with the express consent of counsel for both parties, again entered the room to ascertain if there was a probability of the jury agreeing in a reasonable time, with the view or [sic] entering a mistrial, and discharging them, if there was no such probability. This intention of discharging them at this time if there was no probability of their agreeing was not expressed to the jury. One of the jurors stated, in answer to the judge's inquiry, that he thought that they would soon agree on a verdict, and the judge immediately retired. About eleven o'clock the judge was informed by the bailiff in charge that one of the jurors was at the door of the court room, and desired to speak to him. The judge went to the door, and immediately inside the court room. The juror said they had about agreed on a verdict in favor of the third will, but he desired to ask a question in reference to it. The judge informed him that he could not and would not hear a word from him about the case, except in the presence of the other jurors and counsel for both sides, whereupon the juror said he only wanted to know if it was necessary for all the jurors to sign the verdict, to which the judge answered in negative, and retired. Not a word was said about the case at either visit of the judge to the jury room, either by a juror or the judge, except as above stated.' * * *"

Our court concluded that the "objection that the judge entered the jury room while the jury were deliberating, in view of the facts, is frivolous." We consider a most pertinent distinction between *McCutchen* and the case at bar to be that the judge communicated with the jurors in the first two instances (in *McCutchen*) with the express consent of counsel for both parties. We think it logical to conclude that the judge had, at least, their implied consent to enter the third time at such a late hour and especially since it appears that coun-

sel's consent the first two times was predicated on their desire to have the judge determine if the jury could agree upon a verdict. Also, it appears the judge only went to the door and immediately inside the court room (where the jury was deliberating). While in the case at bar, there is testimony that the door to the jury room was closed. Nor do we find any factual basis in the case at bar for assuming that consent, express or implied, was given by counsel for either side to the judge to enter the jury room. The lack of consent is but one of several factors which we feel, when considered in conjunction, constitute reversible error in the present case. Although the judge was informed by the bailiff that "the jury wanted further instructions from the judge on a charge" no attempt was made to notify counsel for the parties of the jury's request, even though counsel for one party was physically present in the court room at the time.

We are quite certain that the capable and conscientious trial judge (in whom we repose the highest confidence) intended no harm in entering the jury room and communicating with the jury out of the presence of the parties and counsel. Undoubtedly, he was motivated by a sincere desire to expedite the trial.

Notwithstanding, we think that "when it is established that the court, without some overruling necessity therefor," communicates with the jury in the jury room, in the absence of the parties and their counsel, "and without reasonable notice to them and opportunity to be present," we should treat such communications as "conclusively prejudicial" being a deprivation of the constitutional right to a fair trial to which every party litigant is entitled. Feibelman v. Manchester Fire Assurance Co., supra; Glendenning v. Sprowls, supra.

■ Our decision should not be interpreted as condoning the practice of "speculating on the verdict." But, in this case we think the prejudicial effect of the entry into the jury room by the trial judge can only be removed by granting a new trial. We

said in Kuhl v. Long, supra, that either an exception must be made to this action of the court or it must be made a ground of motion for new trial. Motion for new trial was made here and was overruled by the trial court. We feel the error was properly preserved for our review.

For the reasons we have previously discussed, we believe that the actions of the trial judge were of such prejudicial nature in this instance to warrant reversal. In view of this result we see no need to discuss the other errors assigned for reversal.

Reversed and remanded.

HEFLIN, C. J., and SIMPSON, COLEMAN and McCALL, JJ., concur.