BEATTY, Justice.
Plaintiff filed suit against his employer, Seaboard Coast Line Railroad Company, to recover for injuries he allegedly sustained while attempting to throw a switch in defendant’s railroad yard. After a trial on the merits, the jury returned a verdict in favor of defendant, and plaintiff appeals. We reverse and remand.
The issue for our determination is whether plaintiff should have been granted a mistrial on the ground that the trial judge improperly communicated with two members of the jury in separate incidents during the course of the trial. The first incident occurred during a recess on the first day of trial, after one of plaintiff’s witnesses had testified fully and after plaintiff himself had testified on direct examination.
The record reveals that the following transpired:
*97 THE COURT: The Court had just declared a recess and at that point in time when most of the jurors were filing out of the courtroom, a juror by the name of Mr. Ritter, I believe his first name is John, John D. Ritter, Jr., is my recollection, approached the bench as I was leaving the bench and stated that he had something that he wanted to say to the Court. I invited Mr. Ritter into chambers. He came in chambers and stated to the Court — let’s see if I can paraphrase it again — that his father worked for the Frisco Railroad and had worked for about forty years, and that he knew something about railroading and some of the terms that were being used in court because of his father. He further stated in substance that it was concerning him or worrying him, or words to that effect or characterization, and that he talked to his wife last night about whether he should talk to the Court or not and that he decided that he should, and that he had heard his father over the years mention about the company and about employees and about suits. At about this point in time I just stopped Mr. Ritter and told him that I appreciated him coming in and I may need to talk to him further, but that I wanted to check into a matter before we had any further discussion. Also I asked him if he recalled whether a question was asked about members of family or immediate family being employees of railroads when the lawyers were asking the jury, and said that they did not ask that question. It is the Court’s recollection that there was a question asked by Mr. Rutledge. What was your question?
MR. RUTLEDGE: My question was, do any of your husbands work for the railroad.
THE COURT: I don’t know the correctness of this. I am just relying on recollection, but it is the Court’s recollection that they were not asked whether, by either side, as to whether any members of the immediate family, designating what was meant by that, were employees of a railroad or any railroad. It is the Court’s recollection further that both sides, Mr. Rutledge and Mr. Quillen, did ask probably two or three times in different forms if any juror had any recollection by way of a background or experience as to why they felt that they couldn’t sit as a juror in this case and start off even and both sides being even and render a fair and impartial verdict based upon the evidence and upon the law in the case, and no juror responded.
Prior to putting this on record, there has been some discussion in chambers regarding what to do about this particular situation. At this point I think, Vastine, I will let you state what you feel that the Court should do, and Gene, let you state what you think the Court should do.
MR. STABLER: Let me state for the record, Judge, that I had thought the question had been asked to cover parents or brothers and sisters as relatives, but you and Gene and others seem to have a different recollection on that, and I could be wrong on that point.
THE COURT: What is your recollection on that, Mike?
MR. QUILLEN: I just don’t remember.
MR. STABLER: But, anyhow, in a way I feel the treatment is the same either way. Although, obviously, it would be stronger if the question had been asked. You mentioned before we went on the record that after he got into it that you cut him off, isn’t that right?
THE COURT: Yes. I think I stated that I stopped him.
MR. STABLER: The only question that concerns me is that if he was trying to tell the Court that in some way or other he had a fixed opinion or a bias with regard to this situation, if he was trying to tell the Court that, then I think that a [challenge] is in order. If he was not, I don’t think any of us really have any business knowing what he is thinking about the case otherwise. I don’t think there is any real reason for the Court to inquire. What I would ask the Court to do would be simply to state to him or ask him were you trying to tell me that you felt that you had a fixed opinion. Don’t want to inquire — don’t want to go any further, and if he says no, that was not what I had on my mind, then forget it. If *98 he says yes, then maybe the matter has got to be explored further. I do not think the man should be embarrassed. I do not think any inquiry should be made or he should feel like by coming forward to the Court he has done anything other than be conscientious about it.
I would say this, that if a verdict is rendered and he testifies that he was trying to tell the Court that he was prejudiced, I think you really have a problem then. You have an extra now. You have got a heavy problem after a verdict is rendered.
MR. RUTLEDGE: Well, my position is this. I do not recollect that anyone asked about members of family so as to include a father as a railroad employee. But whether they did or they didn’t, obviously the purpose of a venire examination is to determine whether or not any juror would be prejudiced against one or the other side. And we asked this jury at that time when nobody knew anything at all about the case whether or not they had a fixed opinion or anything in their background that would cause them to be anything other than exact equal. At that time when nobody knew anything, every member of the panel indicated negatively that they did not have such a thing.
Now, we have reached a point in the trial where Mr. Stabler has made his opening statement. I have made mine. Some very strong testimony has been introduced by Mr. Ryals, and the plaintiff has himself given his testimony on direct examination.
Now, realistically, I think we all know that the trials go back and forth. To examine the man at this point about his feelings would seem to me entirely inappropriate because it would amount to examining a juror about how he feels about the case in the middle of the case. The question is not how he feels now, but how he felt before he heard any of the opening statements or the evidence.
Now, Mr. Stabler said, well, perhaps he is trying to tell you that he has a bias. Well, I sincerely hope that at this point, which is surely the apex of my case, that there might be some bias in my favor. That is not the inquiry. The inquiry is whether or not before the trial started, before you heard any evidence did you have a fixed opinion or would you be unable to decide the case on the basis of the evidence and the law. Now, that question was asked and answered negatively and at this point I just don’t think that is a proper inquiry, Your Honor.
MR. STABLER: Well, it is done all the time after a verdict comes in, and I agree with you that it has to do — prejudice means to prejudge. It has to do with what your attitudes were independently of the evidence prior to trial. I don’t disagree with your statement of the test, but I think I have stated my position.
THE COURT: All right. I am thinking out loud with you gentlemen now, and that is to bring Mr. Ritter into chambers with the court reporter and to put the entire conversation between the Court and Mr. Ritter on record, of course, and to premise anything that I say to him on the basis that he will have to — that inquiry had been made of him not about whether his father or anyone else worked for the railroad, but as to whether he could be fair and impartial in the trial of the case, and that there was no response from him or from any other juror but what they could be fair and impartial, and whether or not that was a true and correct answer. That is, by not answering. And that, if so, then that he was still qualified as a juror.
MR. RUTLEDGE: Your Honor, at this point of the trial when I hope I am at the best point, to emphasize that at this point he ought to be fair and impartial is to say that what you have heard should not influence him. Judge, that is the reason I put the evidence on.
THE COURT: I realize that that puts it in a difficult position.
MR. STABLER: Now, Judge—
MR. RUTLEDGE: That is why I have introduced this evidence, to influence them.
THE COURT: Suppose this. Again, say you get a verdict and the defendant files a *99 motion for a new trial and gets an affidavit from this juror that says I was just wrong. I just didn’t respond to the question. It just didn’t sink in with me at the moment, but that I felt very strongly one way or the other before this trial started, or even a stronger affidavit?
MR. RUTLEDGE: Suppose I don’t get a verdict because Mr. Ritter goes back to the jury room and says to the jury even after the plaintiff has testified and Mr. Ryals testified the Judge has told me that I should be fair and impartial. Then I don’t have an opportunity to get a new trial. I will worry about the new trial after I get the verdict in this trial.
MR. STABLER: Judge, one thing about your procedure. I am perfectly willing for you to talk to him off the record and to put on the record your summary of the events. I have no objection whatsoever.
THE COURT: I would rather it to be on the record for everybody’s sake.
MR. RUTLEDGE: Your Honor, this can’t help but prejudice my case. There is no way on earth that you can bring that man in here at this point in this trial and inquire as to his impartiality and fairness without creating in his mind the impression that what has taken place here, which is my strongest evidence, should not have influenced him. There is no way you can do this without creating that impression in his mind. And then if he conveys that to the rest of the jury, we, of course, will never know. I can’t in an effort to get a new trial question the jury as to what was said in the jury room.
THE COURT: They can’t impeach their verdict, we’ll put it that way. Let me think about it. Then whatever is done, if anything is done, will be on record and we will have it read back to you gentlemen.
Over plaintiff’s objection, the trial judge later met with juror Ritter in chambers:
(WHEREUPON, the following examination of Mr. Ritter was had by the Court in the Court’s Chambers:)
Q (BY THE COURT:) Let me explain this to you, sir. There are some things the Court can do and some things the Court cannot do.
A Yeah.
Q So that we will have a complete record of everything that transpires, for the benefit of both sides of this case, I have asked Kathie to come in here and to record what is taking place.
A Okay.
Q That way, anything that the Court says or does that may be improper as a matter of law, then it can be preserved for any review if such should become necessary. I am not suggesting that it would be necessary in any way, but it is just routine that in court we take everything down.
A I understand.
Q And that is all this is, is routine, and please do not be influenced in any shape, form or fashion by us being in here together and it being recorded.
A Okay.
Q I stopped you when you came in at the recess from what you were about to tell me.
A Right.
Q For the reason that there are always limitations on what the Court can do and not do. I thought that it was appropriate and proper at that point to stop you. It would be better for me just not to know at that particular stage of things.
Now, first and foremost, by us being in conference here again, please, do not be influenced in any way in connection with this case.
A Right.
Q You start off on Monday morning as a juror by taking an oath.
A Right.
Q You should fulfill that oath and that obligation throughout your tenure as a [jur- or] whether on this case or any other case.
A Right.
Q That is number one.
A Right.
Q Number two, certain questions were asked and certain questions were not asked *100 on what we call voir dire examination by the respective attorneys. It is the Court’s recollection, and I believe you stated to me that it was yours, that no one asked the question about members of your family having worked for a railroad.
A Right.
Q In that regard, that is the responsibility of the attorneys to have asked the question if they feel that it needs asking.
A Right.
Q It is not your responsibility as a juror nor is it the Court’s responsibility. That is their field of responsibility.
A Right.
Q Now, the question was asked by both sides in substance, that if anyone of the members of the panel in searching their own hearts and minds and from their own individual backgrounds, if they felt that there was any reason why they couldn’t start off even and give both sides a fair and impartial trial.
A Right.
Q No one responded to that.
A Right.
Q So, everyone says I can do that.
A Right.
Q Now, that is all that the Court asks you to do or any other juror to do.
A Right.
Q You will weigh the testimony that you hear and naturally at some point in time you will be influenced one way or the other.
A Right.
Q As all other jurors will. If they weren’t influenced, they couldn’t reach a verdict.
A Right.
Q But you will fairly weigh all of the evidence and endeavor to give each side a fair and impartial trial. You are the judges of the facts, you and the jury.
A Right.
Q And you are seeking the truth.
A Right.
Q I am not saying to you at this point to don’t be influenced by what you have heard to this point. That is for you to say. That is for you to say how you will weigh the evidence that you have heard to this point.
A Right.
Q And that you will hear after this point, and you will be influenced in whatever way your conscience dictates for you to be influenced in reaching a fair and just verdict.
A Right.
Q Also, in weighing all of the evidence and in seeking the truth, you will take the law that the Court gives to you at the conclusion of the case. Now, with that explanation, and you notice I am trying to be rather careful in connection with what I am saying because I don’t want to influence you one way or the other. It is improper for me to do so. It would be improper and I am not undertaking to do it.
A Right.
Q And I don’t know what your feelings may be and I am not going to inquire as to what your feelings may be. I know how we started off.
A Right. Right. Well, as I said, this did not come into mind until my wife mentioned it to me. It had not entered my mind until she said something about it and I thought about it. Since listening to it, af-terwards, since we had our short conversation, my mind has been, because of what has been said out here and not because of what I have known, has been swayed back and forth continuous.
Q That is a natural process.
A Right.
Q And the only thing that I am undertaking to do, and the Court would instruct you to do, is just to weigh it, fulfill your function as a juror and give both sides a fair and impartial trial. That is all anybody can ask of you.
A The reason why I told you that because I felt obligated to tell you because I did not — the thought did not come through my mind at the time when he asked that. I guess it passed my mind, but it did not *101 come out that it might be an overriding factor. I have always considered myself a fair person and I try to. weigh each thing on its own.
Q Of course, you will listen to what the Court’s charge is in connection with the law arid all the instructions that the Court gives you at that particular time and use that in connection with the truth as you find it.
A Right.
Q Thank you.
A Thank you.
Q No problem.
A Okay.
After the meeting between the judge and Mr. Ritter, the attorneys were assembled and the court reporter’s transcript of the meeting was read. At that time, plaintiff moved for a mistrial:
MR. RUTLEDGE: Judge, I am going to do something I have never done before. I am going to move for a mistrial. I can’t help but feel that we have a situation here in which a man was in the position of having a father somewhat in the same position as my client, that is, an employee of a railroad company. It may be that Mr. Stabler and Mr. Quillen would not have wanted such a person to sit as a juror on this case. Well, in the event that they had an opportunity to ask whether anybody had any parents or what have you that were employed by the railroad company, they did not do that. They did ask whether or not anybody would be influenced to begin with and favor one side or the other, and this man said no, he wouldn’t be.
Now, we have brought him in here and you have in effect asked him to put out of his mind what he learned in his lifetime through his associations with his father. Now, I can’t help but feel that urging him to do that especially has been so prejudicial to me that the man really could have no real reaction other than leaning as far as he can the other way to try to comply with the Court’s repeated instructions that he be absolutely fair and impartial. I can’t help but feel that would be the effect of it.
THE COURT: Well, let me just say this, and, of course, you have every right and should state your feelings in connection with it and put it on the record. I did say to him that it was appropriate and proper for him to be — or in words to this effect — influenced by what he has heard because he has heard something that would influence him whichever way. I also urged him to listen to the Court’s instructions in connection with the law of the case and all of the Court’s instructions in which I routinely tell them that they are all individuals, they have all had experiences in life, and that law is very reasonable. And I tell them that they will take those experiences individually and collectively and use their good common sense along with the instructions that the Court gives them and the law in making up and reaching their verdict in this case. I routinely do that in every case, not just would do it in this case. I don’t know whether that part of the instructions would overcome the area in which you have concern.
MR. RUTLEDGE: I would have had absolutely no objection to the Court leaving the man alone and saying I am going to give you all instructions at the end of this case, Mr. So-and-so, and I expect you to follow them. That is what I objected before we did this, thinking that that would be the way to handle it to leave him as part of the group and not single him out for special attention. But I don’t see how a general charge like that would overcome—
The second incident occurred later in the trial, during a recess, when a different jur- or approached the trial judge in the bailiff’s office outside the judge’s chambers. Although neither the judge’s nor the juror’s remarks were transcribed during the encounter, the judge summarized the conversation for the record:
THE COURT: As I got off the bench again and came into the office, I was standing there in the bailiff’s office and the juror, Mr. Reeves, R-e-e-v-e-s, [who] *102 as I recall, works for a pharmaceutical company, came in and in substance said, Judge, do I have to forget about all that I know about medicine in connection with being a juror in this case, or words to that effect. I answered him no, sir. I said that you bring with you certain experiences into the jury box that you have had in life and that this will be covered in connection with the Court’s charge to you at the end of this case. He then said something to the effect about a question — if he had a question, and I said if you have some question, if you will indicate it to the Court, then I will supply you with a pad, tablet or something, on which you can write what the question is. There are some questions which are proper and some questions which are not proper, and if you write it that will give the Court the opportunity to pass upon it. He said after you give the charge if I still have some question can I ask it, and I told him, yes, that was permitted and he would be supplied again with a tablet on which to write and he thanked me and left. That is the substance of it.
Plaintiff again objected to the trial judge’s giving an instruction to an individual juror and renewed his motion for a mistrial:
MR. RUTLEDGE: Well, Judge, first of all, I think that the Court ought to lock itself in the bathroom at each and every recess. But that time having already passed, I would have to except to the Court’s statement to the juror. I will have to except first of all to the Court making any statement to the juror. But, secondly, I would have to except to the statement which the Court did make on its merits which you told him that no, he did not have to forget all he knew about medicine, that he could bring his experience [in] life, to the jury box with him. The reason that I do is that the medical condition of the plaintiff is a matter for certain testimony, and there has been no showing that this man has the prerequisite degree of expertise by virtue of his selling pharmaceutical supplies or whatever training he underwent to get ready to sell them, to make an evaluation on his medical knowledge. I think that he has been encouraged by the Court’s remarks to substitute what he conceives to be his medical knowledge for that of a qualified expert. I would except and renew my motion for a mistrial.
THE COURT: All right, sir. What saith the defendant?
MR. STABLER: No exception.
THE COURT: All right. Overruled.
At the conclusion of the evidence, the case was submitted to the jury, which found for the defendant. Plaintiff then filed a motion for a new trial, alleging that:
1. The trial court erred in giving individual instructions to one of the impaneled jurors in the chambers of the presiding judge in the absence of counsel and parties and outside the presence of the other impaneled jurors;
2. The trial court erred in giving individual instructions to another of the impaneled jurors in the bailiff’s office, outside the presence of the other impaneled jurors, outside the presence of counsel, and off the record;
3. The trial court erred in overruling plaintiff’s motions for mistrial made after each incident.
The motion was overruled, and plaintiff brought this appeal.
As the foregoing excerpts from the transcript indicate, we are here confronted with two separate situations in which an individual juror approached the trial judge with a problem. In the first incident the trial judge elected to meet with counsel before proceeding to instruct the juror, on the record, about his duties as a juror. When the second juror, Mr. Reeves, confronted the trial judge with his question, the judge immediately instructed him that he brought his experiences in life into court with him. It is to be noted that on both occasions the events that initially transpired between the judge and the two jurors were off the record and outside the presence of counsel and the other jurors. Although counsel may have had the opportunity to be present at the later discussion in chambers between *103 Judge Callaway and Mr. Ritter, the attorneys were not afforded that chance during the incident involving Mr. Reeves.
This Court has never had occasion to address the question of the propriety of communications during a trial between a judge and an individual juror in the absence of counsel and before the cause has been submitted to the jury. Nor does it appear that the precise issue posed here has been directly confronted by an appellate court in any other jurisdiction. However, our case of Matthews v. Liberty Mutual Insurance Co., 286 Ala. 598, 243 So.2d 703 (1971), although factually distinguishable from the instant case, provides some insight concerning the considerations which should be weighed in a case involving judge-juror communications during a trial.
In Matthews, after deliberations had begun, the jury requested additional instructions from the trial judge. The judge went into the jury room, unaccompanied by counsel for either party, and instructed the jurors that they were to consider all of the evidence together with all of the matters presented to them by the court. This Court held that the action by the trial judge constituted prejudicial error, which mandated reversal. Two considerations were of paramount importance in Matthews in reaching the conclusion that the trial judge’s conduct was conclusively prejudicial: (1) the unique position of a trial judge in a jury trial, and (2) the necessity for maintaining judicial impartiality, both in fact and in appearance.
A trial judge, by virtue of his authority over the conduct of proceedings in the courtroom and his superior knowledge of the law, is in a position from which he may be well able to influence the outcome in a particular case. As this Court pointed out in the Matthews case:
“ * * [A] judge of the court occupies a different attitude towards the jury from that of any other person. In the heat and passion often engendered on the trial, in the conflicting arguments and statement of law by opposing counsel, the jury naturally look to the court to bring certainty out of the confusion. An act, a sentence, or a word from the presiding judge may exert a controlling influence on the verdict. It is for these reasons that a communication by the judge to the jury stands on a different basis from that of another person, and for a like reason the law should throw a higher degree of circumspection around such communications. * * * ’ ” [Quoting from Danes v. Pearson, 6 Ind.App. 465, 33 N.E. 976 (1893).]
Off the record communications between the trial judge and individual jurors, especially when the attorneys for the parties are not given the opportunity to be present, pose the risk that the jurors with whom the court has conversed will be unduly influenced by their individual impressions of what the judge meant and that they will convey those possibly erroneous impressions to the remaining jurors. We are unable to condone the conduct by the trial judge in this case, particularly his conversation with Mr. Reeves, when the judge’s own summary of what took place indicates that Mr. Reeves was given a private instruction by the judge. As we stated in Feibelman v. Manchester Fire Assurance Co., 108 Ala. 180, 19 So. 540 (1895) (quoted in Matthews, 286 Ala. at 604, 243 So.2d 703):
“We can not inquire, in such a case, what instructions were given by the court to the jury, — whether they were correct or incorrect, prejudicial or otherwise. * * The only safe course, therefore, when it is established that the court, without some overruling necessity therefor, gave instructions to the jury * * * in the absence of the complaining suitor’s counsel, engaged in representing him on the trial, and without reasonable notice to them and opportunity to be present, is to withhold all inquiry and investigation into the correctness of the instructions or action of the court, and treat them as conclusively prejudicial, by reason of the suitor’s deprivation of his constitutional right. * * * ”
With regard to the Reeves incident, we also note the express mandate of ARCP 51:
*104 Every oral charge shall be taken down by the court reporter as it is delivered to the jury. . . .
The record does not reflect exactly what the trial judge said to Mr. Reeves in response to his question. Although we would not call into question the integrity of this justifiably respected trial judge or the accuracy, as far as possible, of his summary of the encounter, we feel that a litigant is entitled to the protection of the procedural imperative embodied in Rule 51 which insures that the litigant or his counsel will have the opportunity to know exactly, word for word, what oral instructions are given by the trial judge to the jury.
The second principal concern of this Court in the Matthews case was the necessity of a trial court’s preservation of the appearance of objectivity; as we mentioned in Matthews:
“It has been wisely stated that ‘next to the tribunal being in fact impartial is the importance of its appearing so’. Shrager v. Basil Dighton Ltd., (1924) 1 K.B. 274, 284. . . . [Quoting from Glendenning v. Sprowls, 405 Pa. 222, 174 A.2d 865, 866 (1961).]

“Whether or not injury or injustice has resulted to the litigants by reason of the conduct, is not our primary concern. Rather, our concern is with the implication that attaches to the administration of justice under these circumstances. Confidence in our judicial system is imperiled if such conduct is countenanced in jury trials. Conduct which if proved would give rise to doubt and disrespect, or the mere appearance of such conduct as will not meet with the approval of public opinion, must be severely condemned. It is only through the granting of a new trial in situations like this, as well as vigilant efforts by the officers of the court to prevent such occurrences, that public confidence in the jury system may be preserved. Rasmussen v. Miller, 268 Wis. 436, 68 N.W.2d 16, 18.” [Quoting from Daniels v. Bloomquist, 258 Iowa 301, 138 N.W.2d 868, 872 (1965).]
The actions of the trial judge in the instant case, unfortunately, would pose at least as great a threat to the integrity of our system as those of the judge in the Matthews case; indeed, the appearance here could well lead to greater suspicion in the system, for the communications in this case were made not to the entire jury, but to individual jurors. Although we are certain that the judge was prompted only by the highest motives in privately conversing with Messrs. Ritter and Reeves during the case, nonetheless the actions of the trial court were of such prejudicial nature as to require reversal. In light of our conclusion, there is no need to address the other issue raised by plaintiff.
Accordingly the judgment of the trial court must be, and. is, reversed and remanded.
REVERSED AND REMANDED.
TORBERT, C. J., and MADDOX, JONES and SHORES, JJ., concur.